# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KATHY SUCHOCKI, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 14 C 1607 |
| STAPLES THE OFFICE SUPERSTORE EAST, INC. | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Kathy Suchocki has sued her former employer, Staples the Office Superstore East, Inc., alleging that she was terminated in retaliation for exercising her rights under the Illinois Worker's Compensation Act (IWCA). Staples has moved for summary judgment. For the reasons stated below, the Court denies Staples's motion.

## Background

The Court takes the following facts from the allegations in Suchocki's complaint and the parties' submissions on the summary judgment motion.

For most of the six years leading up to the incident giving rise to this suit, Kathy Suchocki served in various management roles in Staples stores throughout the greater Chicago area. Her first stint with Staples began in May 2006, when she was hired to serve as an operations manager for Staples's Rolling Meadows store. Suchocki's employment with Staples briefly ended when Staples restructured in 2009 and the operations manager position was eliminated at Rolling Meadows, but she was rehired

six weeks later as an associate at Staples's Palatine store.  Soon, Suchocki was transferred to Staples's Glenview facility, a higher volume store, where she was promoted to the position of assistant manager and was put in charge of a team of associates.  After another restructuring, Suchocki was named operations manager of the Glenview store.

Suchocki's duties as operations manager included coordinating and managing inventory control, ensuring the store met presentation standards, overseeing cashiers' performance, and handling bank deposits.  Although she supervised associates to whom she could delegate some tasks, she was also responsible for ensuring that freight was properly and efficiently unloaded and that her store's stockroom was clean and organized.  In Suchocki's experience, it was difficult for her associates alone to effectively and expediently complete these tasks, so Suchocki often found herself tearing through zip ties, sorting products by hand, and manually lifting boxes and inventory.

By most accounts, Suchocki performed at an acceptable level throughout her time at Staples.  A number of people who at one time or another worked under Suchocki spoke highly of her in submissions to this Court.  More importantly, Suchocki was subject to annual performance reviews throughout her tenure at Staples, all of which placed her overall performance above a 2.3.  During fiscal years 2006–2010, Staples deemed employees "good" when they scored between 2.00–2.99: "Performance within this level is viewed positively and meets the Staples standard.  Expected level of performance is demonstrated.  Consistently meets expectations.  Requires a reasonable amount of supervision."  Pl.'s Ex. 6, dkt. no. 68-19, at 21.  For

fiscal year 2011, Staples revised its standard such that employees who scored between 2.3–3.1 were classified as "meets expectations": "Meets most expectations on a regular basis and on some occasions exceeds expectations." *Id.* at 26. As Staples points out, the fact that Suchocki achieved "good" and "meets expectations" composite scores does not mean that she was "good" or meeting or exceeding Staples's expectations in all areas; in fact, Suchocki scored higher than a 2.0 in some facets of her job performance and lower than a 2.0 in others every year she was reviewed. In no performance evaluation, however, did Suchocki's evaluators or other supervisors indicate that any aspect of her job performance was so inadequate as to warrant discipline, formal reprimand, or termination.

In August 2011, Suchocki began to experience progressive numbness and tingling in her fingers, loss of grip strength, and pain in her right hand, left elbow, and left wrist. Believing this injury to have been caused by the repetitive lifting and shelf stocking she felt her job required, Suchocki visited Dr. Daniel Kuesis, who diagnosed her with work-related carpal tunnel syndrome on September 9, 2011. That same day, Suchocki reported her injury to her supervisor, Glenview store manager Jeff Barker. Barker completed an official injury report and apprised district manager David Fater and senior human resources manager Kim Mansker. Fater instructed Barker to promptly submit the report to ESIS, Staples's third party workers' compensation vendor and to be sure to inform ESIS representatives that he suspected Suchocki's claim was not timely because she had reported her injury more than forty-five days after suffering it. ESIS received the report and arranged for Dr. John Fernandez, an independent medical examiner, to conduct a record review. In late December 2011, ESIS informed Suchocki

3

that her claim was not compensable because Dr. Fernandez had concluded that Suchocki's injury was not work-related .

Suchocki filed a formal claim for workers' compensation benefits in early January 2012. She also informed Barker that she was going to file a formal claim, and Barker relayed this information to Fater and Mansker. Although Staples insists that none of these people was aware of subsequent developments in Suchocki's workers' compensation litigation, Staples does not dispute that all of these people knew of Suchocki's claimed injury and that she was formally pursuing workers' compensation benefits. Staples admits that "Mansker remained in contact with ESIS, knew Kathy would need surgery, miss work, and could seek additional workers' compensation benefits. Mansker was also told by either ESIS or Barker that the result of Kathy's workers' compensation case 'was not favorable.'" Staples's Resp. to Pl.'s Stat. of Add'l Facts, dkt. no. 74, ¶ 14. Staples also acknowledges that "Barker was 'kept in the loop' regarding Kathy's workers' compensation case, knew that the definition of her job description was being litigated, and was contacted by ESIS to verify the description." *Id.* ¶ 13.

Suchocki's counsel sent a formal demand letter to ESIS on March 13, 2012, sharing Dr. Kuesis's narrative report and diagnosis and requesting that Staples pay for Suchocki's necessary surgeries, follow-up care, and time off for recovery. In a letter dated March 20, 2012, ESIS again refused to compensate Suchocki based on Dr. Fernandez's assessment of Suchocki's job description and ESIS's suspicion that Suchocki's injury had not been timely reported. ESIS also told Suchocki, however, that it would arrange for her to participate in an independent medical exam with Dr.

4

Fernandez.

In early May 2012, Suchocki filed her first petition for emergency medical benefits in her formal workers' compensation case. Nine days later, Dr. Fernandez reevaluated Suchocki, examining photographs and reviewing her job description. Deeming her credible and relying on her description of her job and its attendant responsibilities, Dr. Fernandez changed his opinion and found that Suchocki's injury was industrial and therefore compensable. Staples responded to Suchocki's petition for emergency medical benefits with a firm denial and refusal to compensate, and it did so again after Suchocki filed a second petition in June and a third in July.

Eleven days after Suchocki filed her third petition, she was informed that Fater, Mansker, Barker, and Shaun Murray—the store manager at the Palatine store, for whom Suchocki had once worked—had come to an agreement to transfer Suchocki back to Palatine. Suchocki recalls Barker informing her that Fater intended to transfer her to Palatine because Glenview (to which she had been commuting for nearly two years) was too far for her to drive. Although the Palatine store was indeed closer to Suchocki's residence, she neither requested nor desired the transfer; in fact, she told her superiors that she did not mind the commute and did not wish to be transferred, and she became emotional upon learning the news of her transfer.

According to Barker, Suchocki never had problems with customers at the Glenview store, and she was credited in many of her performance reviews with playing a significant role in that store's successes. Almost immediately upon arriving at Palatine, however, her new supervisor had a different view. Murray recalls that as soon as Suchocki was transferred to Palatine, customers and associates were complaining

about her, though Suchocki disputes whether such complaints were ever made. Murray believed that customers and associates thought her unapproachable, and he observed numerous deficiencies in her performance, including an overriding and pervasive negative attitude.

By November 2012, Murray had determined to address Suchocki's deficiencies through formal discipline. He received from Mansker and completed a form to establish a performance improvement plan (PIP) for Suchocki, a redline copy of which Suchocki believes was delivered to him prewritten. (Her suspicion is grounded in the redline copy's highlighting of her name and gendered pronouns, and the fact that the few gendered pronouns that were not highlighted are masculine rather than feminine. Staples denies that the PIP was prewritten.) On November 29, 2012, Murray presented Suchocki with her PIP, which enumerated thirty-three separate duties and areas in which her performance required improvement. The PIP gave Suchocki sixty days to show sufficient improvement and warned her that failure to meet the PIP's standards within its given timeframe would result in disciplinary action "up to and including termination." Def.'s Ex. 2, dkt. no. 63-2, at 115. Suchocki refused to sign the PIP because she felt that its criticisms were unfounded and that the plan was directed at illusory failures and performance deficiencies that she had not in fact demonstrated.

Among several other tasks, the PIP imposed upon Suchocki a requirement to provide Murray with written action plans describing how she would meet Staples's expectations. Suchocki failed to provide these action plans, believing that writing and signing them would be tantamount to admitting the contents of the PIP. In late January 2013, Murray and Mansker communicated about Suchocki's "exit strategy," Pl.'s Ex. 48,

6

dkt. no. 69-10, at 24, and on her PIP deadline, Murray provided Suchocki with an update that informed her that she had one more week to submit a written action plan, improve her performance, and otherwise comply with the PIP. Suchocki refused to sign this second PIP document, but she faxed a signed copy with an attached addendum to Murray a few days later. In this addendum, she told Murray that she believed the PIP did not accurately reflect her performance or her failures, that it included unrealistic expectations, and that many of her perceived inadequacies were the result of Murray's refusal to effectively delegate and trust her with responsibility. She also stated that she felt as though some criticisms of her efficiency were responses to her inability to quickly complete tasks whose attendant manual labor violated or tested her doctor's restrictions. When Suchocki failed to deliver a written action plan by the extended deadline, Murray terminated her.

Suchocki filed the present suit in Illinois state court in January 2014, and Staples removed it to federal court in March 2014. The parties then engaged in several months of formal discovery. Originally assigned to the Honorable George M. Marovich, the case was transferred to this Court in late May 2015, after discovery had closed. Shortly thereafter, Staples filed the present motion for summary judgment.

## Discussion

Summary judgment is proper when the moving party "shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court draws reasonable inferences in favor of the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir.

7

2006). The Court's "function is not to weigh the evidence but merely to determine if there is a genuine issue for trial." *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

Under Illinois law, "[i]n general, an employer may terminate an at-will employee for any reason or even for no reason at all." *Sweat v. Peabody Coal Co.*, 94 F.3d 301, 305 (7th Cir. 1996) (citations omitted). "In Illinois, however, it is unlawful to terminate an employee in retaliation for exercising her rights under the IWCA." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th. Cir. 2012). To prevail on such a claim, "a plaintiff must show (1) that he was the defendant's employee before his injury; (2) that he exercised a right granted by the Workers' Compensation Act; (3) and that he was discharged from his employment with a causal connection to his filing a workers' compensation claim." *McCoy v. Maytag Corp.*, 495 F.3d 515, 520–21 (7th Cir. 2007) (internal citation and quotation marks omitted); *see also Clemons v. Mech. Devices Co.*, 184 Ill. 2d 328, 336, 704 N.E.2d 403, 406 (1998). The parties disagree only over whether Suchocki can satisfy the causation element.

Where a retaliatory discharge claim brought under Illinois law is litigated in federal court, "the federal court must apply the standard of the state law to a motion for summary judgment, and not the federal standard." *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 303 (7th Cir. 2010). The Seventh Circuit has observed that "[i]n resolving retaliatory discharge claims, Illinois does not apply the *McDonnell Douglas* burden-shifting framework commonly applied in federal retaliation cases." *Gordon*, 674 F.3d at

8

774 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Instead, a plaintiff attempting to show causation "must affirmatively show that the discharge was primarily in retaliation for [her] exercise of a protected right." *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994). To do so, the plaintiff must "proffer[] sufficient evidence from which a reasonable jury could infer that the employer was improperly motivated." *Id.* If an employer then comes forward with a valid, nonpretextual reason for discharge and the trier of fact believes it, the causation element is not met. *Clemons*, 235 Ill. 2d at 336, 704 N.E.2d at 406. But even an employer who puts forth "an arguably valid basis for firing an employee, . . . may still be liable for retaliatory discharge if the actual motivation for the termination was the employee's pursuit of a workers' compensation claim." *Brooks v. Pactiv Corp.*, 729 F.3d 758, 768 (7th Cir. 2013) (citing *Siekierka v. United Steel Deck, Inc.*, 373 Ill. App. 3d 214, 868 N.E.2d 374 (2007)). "[T]he ultimate issue to be decided is the employer's motive in discharging the employee." *Hartlein v. Ill. Power Co.*, 151 Ill. 2d 142, 163, 601 N.E.2d 720, 730 (1992).

Staples argues that because Illinois courts have not expanded the tort of retaliatory discharge to provide causes of action for retaliatory demotion, changed conditions of employment, transfer, or discipline, the Court should not put any weight on Staples's actions toward Suchocki aside from her termination itself. In that context, it contends that Suchocki cannot carry her burden for three reasons. First, Staples says that the evidence adduced does not support the necessary finding of causation because too much time passed between Suchocki's filing for workers' compensation and her termination. Second, Staples says that the evidence cannot support the inference that Staples retaliated against Suchocki based on further developments in Suchocki's

9

workers' compensation case because Suchocki cannot show that Staples had knowledge of those developments. Third, Staples contends that Suchocki has failed to adduce evidence that Staples's proffered reason for her termination was pretextual.

As an initial matter, the Court rejects Staples's suggestion that none of the actions it took prior to terminating Suchocki is relevant. In the cases Staples cites to support this position, courts refused to recognize retaliatory discharge claims based on changed conditions of employment, demotions, and discipline where the plaintiff did not allege that she was also subject to retaliatory discharge. Staples is correct that there is no cause of action under Illinois law where no discharge has occurred. *Zimmerman v. Buchheit of Sparta, Inc.*, 164 Ill. 2d 29, 39, 645 N.E.2d 877, 882 (1994); *Hartlein*, 151 Ill. 2d at 162–63, 601 N.E.2d at 730. But a discharge did occur here, and the mere fact that there is no standalone tort liability for disciplining or transferring an employee does not mean those sorts of actions are irrelevant in determining whether the employee's eventual discharge was retaliatory. In fact, quite the opposite is true: unusual activity, suspicious timing, and ambiguous statements from management surrounding these types of non-termination events can serve as circumstantial evidence that an employer's proffered reason for the employee's eventual termination was pretextual and her discharge retaliatory. *See Hugo v. Tomaszewski*, 155 Ill. App. 3d 906, 910, 508 N.E.2d 1139, 1141 (1987) ("A plaintiff in a [retaliatory discharge case] will often be required to rely heavily upon circumstantial evidence of the employer's intent . . . .").

Staples insists that a reasonable jury could not infer causation from the record evidence because too much time elapsed between Suchocki's filing for workers' compensation and her termination. Thirteen months passed between the date Suchocki

formally filed for workers' compensation (January 8, 2012) and the date of her discharge (February 8, 2013).  But the Court disagrees with Staples's assertion that causation cannot be reasonably found simply because this much time passed between filing and firing.  "Close temporal proximity provides evidence of causation . . ., and may permit a plaintiff to survive summary judgment provided that there is also other evidence that supports the inference of a causal link."  *Lang v. Ill. Dept. of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004).  Likewise, the Seventh Circuit has noted in retaliation cases under federal law that the passage of a great deal of time can serve as "counter-evidence of any causal connection."  *Johnson v. Univ. of Wis.–Eau Claire*, 70 F.3d 469, 480 (7th Cir. 1995); *see also Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 616 (7th Cir. 2001) (finding an eight-month delay between filing a complaint with the EEOC "too attenuated to support a jury verdict of retaliation").  But the Seventh Circuit has also "said consistently and repeatedly in retaliation cases stretching back more than a decade:  a long time interval between protected activity and adverse employment action may weaken but does not conclusively bar an inference of retaliation."  *Malin v. Hospira, Inc.*, 762 F.3d 552, 560 (7th Cir. 2014)

Under Illinois law, the ultimate question to be resolved in a retaliatory discharge claim is whether the employee's protected act of filing for workers' compensation motivated the employer's decision to terminate the employee, which can be true even in the face of a significant time lapse between the two events.  *See Flick v. S. Ill. Healthcare, NFP*, 2014 IL App (5th) 130319 ¶ 23, 21 N.E.3d 82, 87 (2014) (observing that "significant gaps in time between a plaintiff's activity and termination do not automatically defeat a claim that the termination was retaliatory" in Illinois retaliatory

discharge cases). In *Flick*, the plaintiff was terminated almost two full years after the plaintiff's last conceivable act of whistleblowing on her employer's allegedly unlawful activity. In addition to this large time lapse between the employee's protected activity and her termination, the plaintiff's performance evaluations repeatedly informed her that her management style created friction and had not shown sufficient improvement. *Id.* at ¶ 33. Under these circumstances, the court held that "[t]he gap in time was too long to support an inference of retaliatory motive." *Id.* at ¶ 32.

By contrast, Suchocki offers circumstantial evidence more suggestive of possible retaliatory motive on the backdrop of, at most, a thirteen-month time lapse. Staples admits that Suchocki "never received any 'Notes to File,' reprimands, suspensions, counseling forms, a warning in any form, or a PIP from any Staples manager until after she sought benefits under the Workers' Compensation Act." Def.'s Resp. to Pl.'s Stat. of Add'l Facts, dkt. no. 74, at ¶ 6. Unlike the plaintiff in *Flick*, Suchocki can point to performance evaluations, affidavits from former colleagues, and deposition testimony from her supervisors that plausibly support the inference that she was justified in her belief that she was a strong performer who was undeserving of discipline and ultimately set up to fail. Moreover, a reasonable argument can be made that thirteen months overstates the time lapse in this case, because Suchocki contends that her protected act of seeking IWCA benefits continued at least through Dr. Fernandez's IME in May 2012 (nine months before her termination) and the filing of her third petition in July 2012 (seven months before her termination).

Staples says causation cannot be proven because the evidence cannot support the inference that Staples decision makers knew about the developments in Suchocki's

workers' compensation case. The Court disagrees. For one thing, it is undisputed that every decision maker—Glenview manager Barker, district manager Fater, human resources manager Mansker, and Palatine manager Murray—knew Suchocki was pursuing a workers' compensation claim and litigating her job description. Some also communicated, to greater and lesser extents, with ESIS throughout the process. Armed with varying amounts of knowledge concerning her ongoing IWCA case, these managers transferred Suchocki against her will, disciplined her for the first time in her several years of employment, and ultimately terminated her. Additionally, although her transfer is not itself a basis for a retaliatory discharge claim—and so its occurring quickly after her workers' compensation case gained some traction does not establish a causal link "through evidence that the discharge took place on the heels of protected activity," *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994)—the fact that it transpired so soon after significant developments in her workers' compensation case is circumstantial evidence that might permit a jury to infer that Staples was reacting to and retaliating for her protected action.

Viewed in this light, a reasonable jury could infer that Suchocki's effort to secure workers' compensation caused her termination. Suchocki never received a performance review with a composite score below 2.31, and although she scored lower than "good" in some individual areas prior to filing for IWCA benefits, she was never disciplined prior to filing for workers' compensation. Before the PIP, no performance evaluation or other document ever stated management's purported belief that Suchocki was underperforming so dramatically as to warrant her transfer, discipline, or termination. Soon after Suchocki filed for benefits, and even sooner after Dr.

13

Fernandez's revised IME increased the probability that Staples would be required to compensate Suchocki for her injury, she was transferred against her will to a lower volume store and provided conflicting rationales for the sudden transfer. Shortly after her arrival at Palatine, her new manager determined that Suchocki's performance was subpar and that she deserved her first-ever formal reprimand. All of this—the transfer, the precipitous drop in approval from Barker to Murray, the PIP, and the discharge—transpired within the thirteen months after Suchocki filed her complaint for benefits, the nine months after Dr. Fernandez determined that her injury was industrial, and the seven months after Suchocki last petitioned for benefits. In sum, Suchocki has adduced evidence sufficient to raise a genuine factual dispute over whether Staples's proffered reasons for her discharge were valid and nonpretextual or were instead proffered to disguise a retaliatory motive for her termination.

**Conclusion**

For the foregoing reasons, the Court denies defendant's motion for summary judgment [dkt. no. 61]. The case is set for a status hearing on December 14, 2015 at 9:00 a.m. for the purpose of setting a trial date.

```
                                    _____
                                           MATTHEW F. KENNELLY
                                           United States District Judge
```

Date: December 7, 2015